**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T.M, a Minor With a Disability,** | : | **CIVIL ACTION** |
| **T.M., C.M., His Parents, on Their** | : | |
| **Own Behalf and on Behalf of T.M.** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 16-3915** |
| **THE QUAKERTOWN COMMUNITY** | : | |
| **SCHOOL DISTRICT** | : | |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                        **April 19, 2017**

In this action brought under the Individuals with Disabilities Education Act (IDEA), the parents of a disabled child and the school district want to provide the best educational program for the child. But, they disagree how to achieve it. The parents, who are dissatisfied with the child's progress, complain that the school district is not doing enough. The school district contends that it has devised and implemented an individualized education program which is reasonably calculated to enable the child to make progress in light of his particular circumstances. In essence, the conflict arises from the parties' differing perceptions of the child's abilities and needs.

The parents contend that Quakertown Community School District failed to properly evaluate T.M.'s ability and potential, resulting in an inappropriate educational program. According to the parents, the programming did not effectively address his disability-related needs. They argue that the programming was inconsistent with the requirements for an Applied Behavior Analysis/Verbal Behavior (ABA/VB) program. As a result, they contend that T.M. has not made meaningful progress.

The district argues that the techniques it utilized to identify and evaluate T.M.'s disability-related needs were reliable.  It also contends that its implementation and supervision of T.M.'s special education curriculum aligned with his unique needs and equipped him with the opportunity to achieve meaningful progress.

After reviewing the administrative record and giving due weight and deference to the administrative proceedings, we conclude that the hearing officer did not err in finding that the district appropriately identified T.M.'s intellectual potential, evaluated the development of his unique special education needs, and implemented and supervised an educational curriculum that is producing reasonable progress in light of those needs. Thus, we shall deny the parents' motion for summary judgment and grant the district's motion.

**Background**

T.M. is an eleven-year-old student diagnosed with autism, global apraxia, and an intellectual disability.[1]  His disabilities severely impact his ability to speak, learn, perform activities of daily living, and establish and maintain relationships.[2]  The district agrees he is eligible for special education services under the IDEA and is entitled to protection under Section 504 of the Rehabilitation Act.

Since kindergarten, T.M. has needed specially designed instruction and has been enrolled in autistic support classes provided by the Bucks County Intermediate Unit.[3]  T.M.'s daily educational programming is provided by certified special education teachers, occupational and speech therapists, and special education aides.  The district reevaluates T.M.'s abilities and progress annually.   The team responsible for his individualized education program (IEP) consists of the district's board-certified behavior

analyst, the school psychologist, the special education supervisor, the curriculum consultant, and the parents.[4]

In preparation for T.M.'s fourth grade, the parents met with the IEP team to develop an IEP in May 2014.[5]   The resulting IEP included a review of T.M.'s progress from the previous school year and detailed his current levels of academic achievement and functional performance.[6]   It established baseline data upon which T.M.'s special education team relied to measure his progress and development.  To address the skill areas needing improvement, the 2014–2015 IEP outlined annual goals and plans for specially designed instruction.

As noted in a progress report in June 2014, T.M. demonstrated improvement in several areas, including math, reading, listening, speech intelligibility, copying letters, and typing.[7]   Four months later in October 2014, the district conducted a reevaluation. T.M. scored within the below-average range on several tests measuring his overall general ability, letter and word recognition, math concepts and application, and reading, listening, and oral discourse comprehension.[8]   The behavioral analyst documented consistent success in T.M.'s behavior, and the psychologist noted improvements in his attention and focus.[9]

In January 2015, the parents' independent evaluator, Amy McGinnis, a behavioral analyst and occupational therapist, performed two assessments to evaluate T.M.'s verbal behavior and sensory processing.[10]   McGinnis then called for a complete overhaul of the IEP.  In her opinion, the IEP did not include the necessary detail to effectively measure T.M.'s progress.  She also recommended that T.M. receive twenty

hours weekly of direct, one-on-one ABA programming provided by a personal care assistant.[11]

At the meeting to develop T.M.'s IEP for the 2015–2016 school year, the IEP team discussed McGinnis's recommendations. After considering her assessments, the IEP team agreed to adopt and modify some of McGinnis's goals, including many related to verbal behavior. The team rejected her recommendation for twenty hours of one-on-one programming per week. The IEP team agreed to reevaluate T.M.'s progress later and reconsider McGinnis's recommendations.[12]

The parents requested a due process hearing in September 2015, complaining that the district failed to educate T.M. in compliance with the IDEA for the 2014–2015 and 2015–2016 school years. After a four-day hearing conducted over the course of several months, the hearing officer found that for both school years, the district provided T.M. with a free appropriate public education in compliance with the IDEA, Section 504, and the ADA.[13] He found that the district's staff members were more credible than McGinnis. He concluded that the district's plan provided T.M. with the opportunity to achieve meaningful educational progress.

On appeal, the parents contend that the district failed to provide T.M. with appropriate instruction, specifically a "scientifically based instruction"—one based on ABA principles and curriculum.[14] The district's failure, according to the parents, is twofold. First, the district did not use the assessment tools necessary to identify T.M.'s educational needs. Second, because it did not properly supervise the program, it failed to deliver an appropriate ABA program. As a result, the parents argue, T.M. did not make meaningful progress.

The district counters that the administrative record, including McGinnis's own testimony, establishes that T.M. made meaningful progress. It argues that the IEP team applied objective standards in evaluating T.M.'s progress and implementing an appropriate ABA program. The district contends that McGinnis's recommendations amount to a subjective interpretation of those standards.

The parties agree that T.M. needs an ABA educational program which requires a significant level of repetition and practice. The dispute revolves around what is an appropriate ABA program for T.M. and how to implement it.

### IDEA Standard of Review

The district court conducts a "modified de novo" review of the hearing officer's decision. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). The district court must give "due weight" and deference to administrative factual findings which are deemed *prima facie* correct. *D.S.*, 602 F.3d at 564; *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009). The court may not substitute its "own notions of sound educational policy for those of the school authorities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. Re-1*, 137 S.Ct. 988, 1001 (2017) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)). The district court must defer to the findings of those with the educational expertise.

The court must accept the agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (emphasis

omitted) (quoting *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

**Discussion**

The IDEA requires the state to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1). "The instruction offered must be 'specially designed' to meet a child's 'unique needs' through an '[i]ndividualized education program.'" *Endrew F.*, 137 S.Ct. at 999 (emphasis omitted) (quoting 20 U.S.C. §§ 1401(29), (14)). The instruction must prepare the child for "further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Ferren C. v. Sch. Dist.*, 612 F.3d 712, 717 (3d Cir. 2010).

Although the state is not required to "maximize the potential of every handicapped child," it must provide an education that confers a "meaningful benefit" to each child. *Ridley School Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (citing *D.S.*, 602 F.3d at 556). The benefit must be substantial, not minimal. *Endrew F.*, 137 S.Ct. at 1001.

To achieve a meaningful benefit, the school district must fashion a uniquely tailored individualized education program, or IEP, for the child. *Endrew F.*, 137 S.Ct. at 991 (citing 20 U.S.C. §§ 1401(9)(D), 1412(a)(1)). The IEP is the roadmap for the child's educational progress. It must be reasonably calculated to enable the child to make progress "appropriate in light of the child's circumstances." *Id.* at 999. It must "set out a plan for pursuing academic and functional advancement." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV)). The core of the IDEA is the collaborative process between the parents and the school officials to fashion the IEP. *Id.* at 994 (citing 20 U.S.C. § 1414).

This collaboration among the parents and educators ensures careful consideration of the child's individual circumstances. *Id.*

The IEP's purpose is to establish a plan for each child's academic and functional advancement. *Id.* at 999 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV)). It is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)). It must include a statement of the special education, related services, supplementary aids and services, and program modifications or supports for school personnel that will be provided to enable the child to attain the program's goals. 34 C.F.R. § 300.320(a)(4). Regular progress monitoring, through periodic progress reports provided to the parents and the IEP team, is critical to a substantively appropriate IEP. 34 C.F.R. § 300.320(a)(3).

In developing the IEP, a school district is not required to provide a specific program or employ a specific methodology requested by the parent. *See Rowley*, 458 U.S. at 199 (explaining that the IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential"). Although a school district is required to provide a free appropriate education to a disabled child, it is not required to provide the *best* possible education to maximize educational benefits. *Rowley*, 458 U.S. at 197 n.21; *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 178 (3d Cir. 1988). Nor is a school district required to provide each disabled child with opportunities substantially equal to those afforded to children without disabilities. *Endrew F.*, 137 S.Ct. at 1001 (citing *Rowley*, 458 U.S. at 198).

The parents contend that the IEP failed to provide T.M. with a meaningful educational benefit at the time it was developed. They claim that the district failed to properly identify and evaluate T.M.'s disability-related needs and adequately supervise the program implementation. The parents conclude that, as a result of these failures, T.M. did not make meaningful progress. They challenge the evaluation process and the implementation of the plan. We address each contention in turn.

*Identification and Evaluation of Disability-Related Needs*

The starting point of the IEP process is to identify the child's "intellectual potential." *Shore Reg'l*, 381 F.3d at 198 (quoting *Polk*, 853 F.2d at 181). This requires the school district to determine the child's aptitude and achievement. 34 C.F.R. §§ 300.304(b)(3), (c)(1). It must evaluate the child using proper assessment tools that identify and monitor the development of his or her unique special education needs. 20 U.S.C. § 1414; 34 C.F.R. § 300.304.

The parents raise two arguments regarding the identification and evaluation of T.M.'s disability-related needs. First, they complain that the district failed to properly identify T.M.'s skill deficits. According to the parents, the evidence demonstrates T.M. was not provided with sufficient opportunities to practice his speech skills, improve his behavioral issues, or develop his sensory awareness and activities of daily living. They contend that as a result, the district failed to identify his intellectual potential and the needs to achieve it. Second, the parents claim that the district's evaluations do not provide a comprehensive statement of T.M.'s abilities. Without a thorough evaluation, a meaningful plan aimed at achieving progress cannot be developed. If the parents are

correct as to either claim, the entire IEP is skewed and may not provide the meaningful educational benefits to which T.M. is entitled.

Central to the parents' claim is that the district did not use the Verbal Behavior Milestone Assessment and Placement Protocol (VB-MAPP), a widely recognized assessment for autistic children. The parents contend that the assessments administered by their evaluator, McGinnis, comprehensively measure all aspects of T.M.'s functioning, including his academic, social, and verbal abilities, as well as skills related to activities of daily living. The parents argue that without data from these assessments, the IEP team lacked information necessary to devise an effective IEP.[15]

Contrary to the parents' contention, the IEP team did consider the VB-MAPP assessments. The team included the results in the 2015–2016 IEP.[16] Because the team did not completely adopt the results of the VB-MAPP does not mean they were ignored.

The district's behavior analyst explained that the IEP team did not place great weight on the results of the VB-MAPP assessment because it is typically administered to younger children and does not adequately test for functional skills of fifth graders.[17] Instead, it is designed to address proficiency of verbal behavior skills that children typically acquire between birth and four years.[18] The parents counter that because T.M.'s skill level falls below that of a typical four-year-old, the VB-MAPP is appropriate.[19]

The VB-MAPP is only one type of evaluation method. The IDEA does not obligate a school district to use a particular methodology to evaluate a student's intellectual potential. The district used other assessment tools which the hearing officer found were objective and uniform.

T.M.'s speech and language pathologist administered the Functional Skills Assessment tool, a comprehensive evaluation for autistic individuals—which was, according to the district's behavior analyst, more appropriate for T.M.'s age than the VB-MAPP.[20]  The Functional Skills Assessment evaluated his ability to use verbal language, including communicating short messages, requesting information, obtaining items, using social manner language such as "please" and "thank you," asking for permission, and communicating his name, location of objects, hunger/thirst and emotional states.[21]  It also evaluated his ability to describe objects, communicate safety information and complex directions, apologize for mistakes, and other skills.[22]

The district did not rely solely on the Functional Skills Assessment.  It also utilized additional assessments in the following areas: the Goldman Fristoe Test of Articulation 2 to measure speech articulation; the Peabody Picture Vocabulary Test 4 to measure vocabulary proficiency and pronunciation of consonant sounds in the initial, medial and final positions of words; and the Letter and Word Recognition and Reading Comprehension subtests of the Kaufman Test of Educational Achievement, Second Edition, to measure reading skills.[23]  The evaluation procedures were selected to address the areas of T.M.'s intellectual potential identified in the IEP as needing development.  The district considered these assessments together with a review of T.M.'s then-current IEP goals, input from his special education teacher and his parents, and the school psychologist's observations.[24]  Given the district's reliance on these numerous measurement tools, the hearing officer did not err in finding that the district properly evaluated and identified T.M.'s academic and verbal abilities.

The parents also contend that the district failed to address T.M.'s need for development of activities of daily living and sensory awareness. These activities include self-care skills and fine motor coordination for effective use of tools, such as a pencil. Just as the district properly identified T.M.'s skill deficits and abilities in verbal behavior, its identification and evaluation of his sensory motor skills were similarly appropriate.

The district's occupational therapist worked on T.M.'s "ability to perform expected routines, activities and skills necessary in [his] school placement."[25] In the 2014–2015 IEP, T.M.'s academic teacher worked with his occupational therapist to complete the School Function Assessment (SFA) to identify his strengths and limitations performing school-related functional tasks.[26] The SFA described T.M. as needing, among other things, greater support with handwriting, compliance with adult directives, and minimizing distractions during lessons.[27] For example, the 2014–2015 IEP explained that T.M.'s handwriting was difficult to read because oftentimes he added extraneous pen strokes to each character.[28] Staff provided paper with structured boxes to assist T.M. with appropriately conforming his pen strokes to each character's shape and size. The IEP recommended continuing biweekly occupational therapy sessions to address his fine motor and coordination skills.[29] Another SFA was completed as part of the 2014 reevaluation report and identified cognitive and behavioral tasks as the areas in which T.M. requires more assistance due to less consistent performance.[30]

The hearing officer correctly found that the district appropriately identified T.M.'s behavior and skills. The record supports the hearing officer's conclusion that the district's evaluations were sufficient. The evaluation procedures were as effective as the VB-MAPP assessment in providing a comprehensive picture of T.M.'s academic

potential and his special education needs. 34 C.F.R. § 300.304. The evaluations monitor his progress in improving, for example, pronunciation and articulation, making requests, communicating his needs, conforming handwritten pen strokes, and complying with adult directives. The IEP team possessed the information necessary to devise an effective educational plan. Therefore, the record supports the hearing officer's findings that the district appropriately identified and evaluated all of T.M.'s disability-related needs.

*Implementation of ABA Programming*

Reduced to its essence, the dispute is whether the district must provide T.M. a strict ABA program or one based on ABA principles. The parents argue that the district failed to implement an educational program consistent with established ABA requirements. They contend that the failure to implement their evaluator's recommendations for data collection and one-on-one instruction deprived T.M. of a free appropriate public education.

The hearing officer agreed with the district that its implementation of ABA-based educational programming, not strict adherence to ABA, was appropriate. After comparing the qualifications of the witnesses and making a credibility determination based on the testimony, he found the district's staff members more credible than the parents' evaluator.

The parents' evaluator, Amy McGinnis, is an occupational therapist and board-certified behavioral analyst. She has no four-year college degree. She has no regular or special education teaching degree or experience.[31] Given McGinnis's certification as a behavior analyst, the hearing officer found her an expert in ABA programming. But, in

light of her lack of experience in public school teaching and her unfamiliarity with T.M.'s reading and math curriculum, he determined that "her recommendations about reading, math, speech and language were beyond her specialty areas."[32]

The district's special education staff members, on the other hand, are well qualified and experienced in all areas. The district's board-certified behavioral analyst, who has worked in public schools for more than ten years, holds a bachelor's degree in psychology, a master's degree in ABA, and a doctorate degree in educational leadership.[33] The district's psychologist has worked for more than a decade assessing children with disabilities in a school setting, including children with autism and apraxia.[34] The former Supervisor of Special Education and member of the IEP team has bachelor's and master's degrees in speech therapy, master's degrees in educational administration and in pupil personnel services, and a doctorate degree in educational leadership.[35] The then-current Supervisor of Special Education has a bachelor's degree in special education, a master's degree in early childhood education, and a supervisory certificate in special education.[36] The program coordinator and educational curriculum consultant, a member of the IEP team, has been with the Bucks County Intermediate Unit since 2004. She has bachelor's and master's degrees in education with a bachelor's certificate in special education and a master's certificate in education technology.[37]

The hearing officer compared not only the relative qualifications, but also the time the staff members spent observing T.M. in the school setting. He noted that the district's staff saw T.M. for 1,440 hours over the two-year period they worked with him.[38] McGinnis observed him on two separate days for a total of sixteen hours. On one of her

visits, substitutes were filling in for T.M.'s regular special education staff members.[39] McGinnis acknowledged that this may have affected T.M.'s behavior and performance during his lessons on that visit.[40]

The hearing officer discounted McGinnis's critique of the IEP's academic, behavioral, and speech goals because she is not a certified teacher, psychologist, or speech therapist. As a behavioral analyst and occupational therapist, McGinnis does not possess the requisite educational background to opine on those topics.

The hearing officer concluded that the district's special education staff members were more credible than McGinnis. There is no reason to disturb the hearing officer's credibility determination.

Even if we were to find that McGinnis's testimony should have been afforded equal or greater weight than that of the district's staff, we would still conclude that the record supports the determination that T.M.'s ABA programming was appropriately implemented. The non-testimonial record supports the conclusion that T.M. was afforded the opportunity for meaningful educational progress. Indeed, the IEP and reevaluation documentation demonstrate that T.M. progressed incrementally in all areas of unique need.

The parents claim that because the underlying data was unreliable and the programs were inconsistently implemented and supervised, the district incorrectly concluded that T.M. made meaningful progress. First, the parents argue that the district did not utilize sufficiently reliable measurement techniques to ensure an objective, accurate assessment of T.M.'s progress. Second, they contend that the district failed to adequately supervise the program to ensure its effective and consistent implementation.

They argue that the hearing officer erroneously relied on the district's progress reports to track T.M.'s progress.

Reliability of The District's Measurement Techniques

The parents' criticism of the reliability of the district's measuring T.M.'s problematic behavior goes to the frequency of the recording of the behavior.[41] A functional behavior assessment revealed that T.M. engaged in behavior to avoid a demanded task or when he is not feeling well.[42] T.M.'s behavior was observed throughout the entire school day. The special education staff recorded the time of day when T.M. engaged in problematic behavior. Instead of recording the behavior at the exact time it occurred, they recorded T.M.'s behavior as occurring within a five-minute interval. The district pointed out that T.M. mastered his behavior goal by engaging in problematic behavior in one percent of the total measurements taken.[43]

The parents contend that instead of recording behavior data in five-minute intervals, the district should have relied on the "gold standard" for data collection, which measures T.M.'s problematic behavior in shorter time periods. McGinnis explained that a shorter interval of five to ten seconds lowers the risk of skewed data.[44] To support their argument that shorter intervals should have been used to measure T.M.'s behavior, the parents point out that McGinnis observed "a significant level" of problematic behaviors and the hearing officer erred by relying on the district's progress reports.[45]

McGinnis's observations and data collection occurred over the course of only two school days. On one of those days, substitute staff members replaced T.M.'s regularly scheduled special education team.[46] When asked whether that day was an atypical day

for T.M., she acknowledged that the regular staff's absence could have affected his behavior.[47]

The district's special education staff credibly explained their decision to rely on the five-minute interval data collection method instead of McGinnis's recommended "gold standard." The board-certified behavior analyst testified that smaller intervals may overstate rather than understate targeted behavior.[48] She also explained that interval data collection is widely used in her field and research supports expressing the frequency of problematic behavior in percentages.[49] Switching to McGinnis's recommended method would have required an additional staff member dedicated solely to data collection for one student because measurements are meant to be recorded contemporaneously. According to the district's witnesses, employing a staff member dedicated exclusively to data collection is done only in a clinical setting, not a public school setting.[50]

The district need not use the "gold standard" to measure T.M.'s progress in reducing problematic behavior. Using the longer rather than the shorter interval measurements did not affect the substantive adequacy of the IEP. The district's evaluation methods were reliable. Without evidence that other or additional measurement techniques were necessary to ensure reliability, the hearing officer's finding favoring the district's measurement techniques was not erroneous.

Program Supervision and Progress Monitoring

Contrary to the parents' contention, the district's plan was supervised to ensure objectivity and uniformity in its implementation. To ensure consistency across environments and staff, the 2014–2015 IEP defines the behavior that impedes T.M.'s

ability to learn,[51] objective forms of measurement to monitor progress,[52] and regular reporting requirements to the special education staff and the parents.[53]  The district continued to employ these objective strategies into the 2015–2016 school year.  The annual goals included updated descriptive present levels of performance, progress monitoring, and regular reporting requirements, just as in the previous year.[54]  With respect to T.M.'s progress, the district's plans were effectively implemented and supervised.  They were calculated to reduce the frequency of T.M.'s problematic behavior and to improve speech intelligibility, sensory motor skills, and activities of daily living.

The parents claim that T.M. failed to make meaningful progress in reducing the frequency of his problematic behavior because the district's plan was ineffectively implemented and supervised.  Yet, the district's plan addresses this problem by laying out comprehensive Positive Behavior Support Plans to address T.M.'s unique needs.

The 2014–2015 IEP includes baseline frequency measurements of T.M.'s problematic behavior.[55]  In addition to including these measurements, the 2014–2015 IEP addresses annual goals for the implementation of coping mechanisms.  One short-term objective is for T.M. to select a coping strategy, such as taking a break to bounce on a therapy ball when prompted with a visual strategy card after he has become upset or frustrated.[56]  The visual strategy card states reminders such as "take deep breaths," "ask for a break," or "use my words to express my needs."[57]  The annual goal provided for measurements to be taken at five-minute intervals and quarterly progress reports to the parents.  The IEP also outlines positive reinforcement strategies for T.M.'s special

education staff to implement when he engages in problematic behavior, such as providing him with certain crunchy foods to avoid teeth-grinding.[58]

In the 2014 reevaluation report, the district's behavioral analyst reviewed data from the most recent progress report and compared it to the data from the start of the 2014–2015 school year. The data demonstrated that T.M. "consistently maintained his behavioral success," and tracked his progress.[59]

In the 2015–2016 IEP, the behavioral analyst reported that T.M. had "minor increases" in his problematic behavior.[60] To address this unsatisfactory progress, additional proactive strategies were added to the Positive Behavior Support Plan and new replacement activities were recommended.[61] At the parents' request, the annual goal to monitor the effectiveness of coping mechanisms was removed from the updated IEP.[62] Instead, another annual goal was implemented. T.M's goal, when told he may not have a certain object or engage in a certain action, was to remain calm and quiet without engaging in problematic behavior.[63] To reach this goal, T.M.'s short-term objective was to remain calm for ninety percent of the measured instances.[64] The special education staff collected data daily and the IEP team provided quarterly progress reports to the parents.

The administrative record demonstrates that in response to minor setbacks in reducing T.M.'s problematic behavior, the district modified its programming. New strategies were implemented instead of continuing to employ those in the 2014–2015 IEP. The parent's requests were taken into account and the plan was modified accordingly.

The district's strategy for dealing with T.M.'s problematic behavior "is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *T.L. v. Lower Merion Sch. Dist.*, Civ. No. 15-0885, 2016 WL 3405453, at *15 (E.D. Pa. June 20, 2016) (internal quotation marks omitted) (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 172–73 (2d Cir. 2009)). The evidence supports the hearing officer's finding that both IEPs were appropriate to address T.M.'s particular behavioral issues.

The parents also argue the district did not afford T.M. sufficient opportunities to practice his speech skills outside the individual instruction setting, resulting in a lack of meaningful progress in his speech intelligibility.[65] They point to the fact that T.M. struggles to communicate in a way that is understandable to unfamiliar listeners, and he has not made progress in his ability to articulate.[66] In the 2015–2016 IEP, they complain that T.M.'s speech has "regressed" since last year. According to his parents, he can no longer articulate the word "bathroom," which previously "sounded pretty good last year."[67] They attribute this regression to the change in the district's special education staff and less emphasis on speech practice in the curriculum.[68]

Contrary to the parents' contentions, the record reveals that T.M.'s daily programming included elements of speech instruction tailored to his learning style. T.M. participated in daily drill exercises to reinforce continuous practice and improve his articulation skills.[69] He received speech instruction four days a week.[70] His speech therapist and special education teacher consulted monthly.[71]

The IEPs set goals to improve T.M.'s speech intelligibility and functional communication skills. The 2014–2015 IEP includes an annual goal to improve "his

overall speech intelligibility and sound production skills" during articulation drills and verbal language tasks.[72]   The IEP goal provides for baseline measurements, data collection and observation, and quarterly progress reports.   T.M.'s short-term objective within this goal is to "initiate use of self-advocacy statements/requests that he articulates in full sentences with intelligible speech to a quantity of at least 10 [words]."[73] At the time the IEP was drafted, his baseline ability was measured by intelligible articulation of one to four-word utterances to indicate, for example, that he is going to lunch or wants to go to bed.

The 2015–2016 IEP updates this annual goal, taking into account T.M.'s specific progress and areas for improvement since the last IEP.   In the context of articulation drills and verbal language tasks, the IEP states that T.M. "will improve his intelligibility by improving fluency, shaping of vowel sounds in words and appropriate speech sounds."[74]   Just as the previous IEP did, the updated goal provides for baseline measurements, data collection and observation, and quarterly progress reports.   The short-term objectives address the specific areas needing improvement.   For example, T.M. will strive to produce the correct vowel sound in all positions in words.   To support his needs in the classroom, he will "use self-advocacy statements/requests using 4-6 word sentences with intelligible speech."[75]   This latter short-term objective builds upon T.M.'s baseline ability of articulating one- to four-word utterances from the previous school year.

With respect to T.M.'s speech skills, the district's special education programming is reasonably calculated to enable him to receive significant educational benefits in light of his aptitude and needs.   Speech practices essential to T.M.'s learning style were

incorporated into his daily programming. The IEPs track short-term and annual goals to address T.M.'s objective progress and areas for improvement. For example, a report tracking T.M.'s progress from the 2014–2015 baseline indicates that one month after the IEP was drafted, he was able to "independently articulate[] long vowel sounds with 50% accuracy in isolation."[76] As we have noted, the updated IEP for the 2015–2016 school year addresses T.M.'s progress with vowel sound pronunciation and sets goals for him to continue to improve this skill.

The record supports the hearing officer's determination that the district's speech-related programming provides T.M. with an opportunity for "meaningful benefit." *Ridley*, 680 F.3d at 269. The daily lesson plans address his specific learning style by focusing on repetition. The IEPs employ evaluations to monitor his progress in improving pronunciation and articulation, making requests, and communicating his needs. The 2015–2016 IEP addressed the outcome of these evaluations by tailoring his specially designed instruction accordingly. For the areas in which he improved, the IEP set goals for him to continue to develop the skill. Thus, the hearing officer correctly found that T.M.'s speech-related instruction was reasonably calculated to provide him with the opportunity to make meaningful progress.

As with T.M.'s opportunities to develop his speech intelligibility, the district appropriately monitored his progress in sensory motor skills and activities of daily living. As noted, T.M. demonstrated improvements in his handwriting. The updated IEP for the 2015–2016 school year reported the results from prior testing and T.M.'s progress. For example, the report stated that T.M. "progressed when writing with boxes."[77] As part of the 2015–2016 IEP, his IEP team employed different strategies to continue to improve

his handwriting. Using a weighted pencil was ineffective because he applied too much pressure, ripping the paper. To help T.M. adjust the pressure he applies to a writing instrument, the IEP explained that he was given a variety of small objects to handle during therapy sessions. The plan recommended he use a mechanical pencil to better manage the pressure he exerts while writing. To help control the size and shape of T.M.'s handwritten characters, his occupational therapist used her finger as a physical barrier on the page. As with the previous year, the updated IEP recommended he continue with occupational therapy sessions to develop his handwriting and other fine motor skills.[78] It also included modified annual goals that addressed T.M.'s activities of daily living, including increasing the consistency with which T.M. independently washes his hands.[79]

The administrative record demonstrates that the district's programming included sufficient opportunities for T.M. to develop his sensory motor skills and activities of daily living. The record reflects that T.M. made incremental progress in these areas.

The parents also contend that T.M. cannot benefit from interacting with his classmates, neither in his special education nor regular education curricula.[80] This critique essentially amounts to a dispute over whether T.M. benefits from mainstreaming. The IDEA requires school districts to place a student in the "least restrictive environment" capable of providing a meaningful educational benefit. *Ramsey*, 435 F.3d at 390 (citations omitted); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1215 (3d Cir. 1993). Placing a student in the least restrictive environment requires a school district to educate children with disabilities with non-disabled children to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A).[81] If placement outside the

regular classroom is necessary, then a "court must decide whether the school has mainstreamed the child to the maximum extent appropriate." *Ramsey*, 435 F.3d at 390–91 (quoting *Oberti*, 995 F.2d at 1215). One goal of mainstreaming is to provide the child with opportunities to develop social and communication skills. *Id.* (citing *Oberti*, 995 F.2d at 1216).

In contending that T.M. cannot benefit from socialization opportunities, the parents point out that the district's board-certified behavior analyst observed T.M.'s failure to interact with his peers on the playground during recess.[82] They argue that because T.M. lacks social skills necessary to benefit from interactions with his peers, the district was obligated to increase the amount of time T.M. spends per week in isolated programming. Specifically, the parents claim that the district should have adopted McGinnis's recommendation to incorporate twenty hours per week of one-on-one ABA programming taught by a personal care assistant.

Incorporating twenty hours of isolated ABA programming into T.M.'s weekly academic schedule could be accomplished in one of two ways. Either the ABA programming would replace other elements of his already established daytime curriculum, or the one-on-one lessons would take place after school in a community or home setting.[83]

The district's decision not to adopt her recommendation in either a daytime or after-school setting was appropriate. If the one-on-one programming were implemented during school hours, T.M.'s specially designed instruction would require significant changes. T.M.'s school day lasts 6.5 hours, including lunch, recess and study periods. McGinnis recommended that at least four of those 6.5 hours—sixty percent of T.M.'s

school day or more—should be devoted to one-on-one ABA instruction.[84]  She testified that part of T.M.'s established curriculum already included opportunities for one-on-one instruction, but conceded that her recommendation would require changes to teaching procedures, IEP goals and data collection methodologies.[85]  She did not suggest which areas of T.M.'s school-day programming would be changed or eliminated to accommodate the ABA programming.[86]

The parents appear to suggest that the socialization be replaced.  But, the record demonstrates that T.M. did benefit from socialization and was making progress.  As the hearing officer found, the district ensured that T.M. has regular contact with his non-disabled peers and access to the general education environment.[87]  His teacher testified that T.M. was afforded daily opportunities to interact with his special-education peers during built-in lesson breaks and group activities and with regular-education students during lunch, recess, his special classes including art and music, and in the halls.[88]  T.M. also participated in daily social skills lessons.  His teacher based the lessons on her observations of behavior from the previous day and focused on, for example, initiating conversation.[89]

T.M.'s progress with increasing and developing socialization opportunities was tracked through the IEPs.  The 2014 reevaluation report assessed T.M.'s social behavior and recognized that he consistently maintained appropriate social and physical boundaries by keeping his hands and feet to himself and respecting others' privacy.[90]  The reevaluation report noted that T.M. continued to develop other skills including saying "please" and "thank you," apologizing for mistakes, and communicating short messages.[91]  The 2015–2016 IEP included goals for T.M. to practice initiating and

responding to one-on-one interactions with his regular-education peers.[92]  T.M.'s autistic support teacher testified that all of her students, including T.M., benefitted from socialization opportunities.[93]  This is underscored by McGinnis's own report, which acknowledges that T.M. made "significant progress" in areas of social communication.[94]

Because McGinnis's recommendation for one-on-one ABA programming lacked details and T.M. was making progress in socialization, the district's decision not to implement it was appropriate.  Further, the district did not categorically decline to consider McGinnis's recommendation.  Instead, the updated IEP provided that the team would reconsider implementing the recommendation into T.M.'s plan depending on his progress throughout the school year.

Although the IEP team ultimately declined to implement twenty hours of one-on-one programming, the hearing officer emphasized that the district did not reject McGinnis's recommendations in their entirety.  The updated IEP for the 2015–2016 school year reveals that the district, after reviewing her report at the IEP meeting, adopted many of its recommended annual goals and plans for specially designed instruction.[95]  The updated IEP also noted that, as T.M. makes progress, the IEP team will consider her recommendations for future instructional needs.[96]

Finally, the hearing officer properly relied on the district's progress reports and evaluations to track T.M.'s progress.  The underlying data, as we have noted, was reliable and demonstrated that T.M.'s incremental progress was meaningful.

The hearing officer correctly analyzed the appropriateness of the IEPs at the time they were issued, not "at some later date."  *Carlisle*, 62 F.3d at 529 (quoting *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)).  The appropriateness

of the IEP is judged as of the time it was developed. *D.S.*, 602 F.3d at 564–65. Evidence acquired after the creation of the IEP is useful only to evaluate the reasonableness of the district's decisions at the time they were made. *Id.* at 565 (citation omitted). The hearing officer concluded that "[t]he record is replete with evidence, at the time the IEP was drafted," that the district offered T.M. a free appropriate public education.[97]

McGinnis's conclusion that T.M. did not make meaningful progress is contradicted by the evidence. T.M.'s incremental progress is documented throughout the 2014 reevaluation report and the updated IEP for the 2015–2016 school year. In fact, McGinnis conceded that T.M. made "significant progress" and "clearly excels" in a variety of areas, including, but not limited to, physical motor skills (handwriting and typing);[98] repetitive tasks, such as assembling and taking apart nuts and bolts;[99] and verbal behavior, such as independently labeling the ongoing actions of his peers or staff, understood by an unfamiliar listener.[100] McGinnis acknowledged that T.M.'s progress in mastering activities of daily living, such as washing his hands, suggest he is capable of incorporating additional activities, such as brushing his teeth.[101] This evidence supports the hearing officer's finding that T.M. was making steady progress appropriate in the light of his circumstances.

The record supports the conclusion that T.M.'s ABA-based programming was appropriately implemented. Given the qualifications of the district's staff and the amount of time they spent with T.M., the hearing officer properly accorded more weight to their testimony than that of the parents' evaluator. The district's chosen data collection techniques produced reliable records and provided a comprehensive picture

of T.M.'s progress.  The IEP programming was implemented and supervised to ensure objectivity and uniformity.  Because T.M. demonstrated continuous incremental progress, the district's IEPs were reasonably calculated to enable T.M. to make meaningful progress.  This is corroborated by the school psychologist's testimony that a comparison of the standardized achievement test results from 2015 to the previous year demonstrated that T.M. made one full year of progress.[102]

In summary, the IEP team appropriately identified T.M.'s intellectual potential to evaluate his academic and behavioral development.  The district implemented a program that was providing T.M. with a meaningful educational benefit.  The hearing officer's findings were not erroneous.

### The Rehabilitation Act and The Americans with Disabilities Act

The parents assert that the district's failure to conduct appropriate evaluations of T.M., to provide him with an appropriate educational program, and to properly implement his program establishes that he has been unlawfully denied a free appropriate public education in violation of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA).  Because "the remedies, procedures and rights" under the ADA are the same as those under Section 504, these two claims are treated as analogous.  42 U.S.C. § 12133; *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996); *Travis G. v. New Hope–Solebury Sch. Dist.*, 544 F. Supp. 2d 435, 445 (E.D. Pa. 2008).

Because the district did provide T.M. with a free appropriate public education in compliance with IDEA, it did not violate Section 504 or the ADA.

**Conclusion**

The hearing officer's decision is supported by the evidence. The district's IEPs and related services were specifically designed to meet T.M.'s needs and were reasonably calculated to enable him to make progress appropriate in light of his unique circumstances. Therefore, because the district is providing T.M. a free appropriate public education, we shall grant the district's motion and deny the parents' motion.

# ENDNOTES

[1] Compl. ¶ 5. Autism is a neurodevelopmental disorder marked by impaired social and communicative skills, "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 C.F.R. § 300.8(c)(1)(i). Global apraxia is a type of speech impairment that affects the intelligibility of speech and all other areas of communication. Def. Br. in Supp. of Mot. Summ. J. (Doc. No. 11-3) at 2; Hr'g Officer Decision at 3 ¶ 1, Admin. R. (AR) at 01598.

[2] Compl. ¶ 5.

[3] Reevaluation Report, October 30, 2014, District Ex. S-13 (Reevaluation Report) at 2–3, AR 00261–62. Each school district in Pennsylvania is assigned to an intermediate unit, which provides the school district with education support and services. 24 Pa. Stat. §§ 9-901-A, 9-902-A.

[4] *See generally* Hr'g Officer Decision at 13 ¶¶ 96–101, AR 01608.

[5] Pl. Stmt. of Undisputed Facts (SUF) (Doc. No. 12-1) ¶ 16; Def. Counter-Stmt. to Pl. Stmt. of Undisputed Facts (Counter-SUF) (Doc. No. 14-1) ¶ 16; IEP, May 22, 2014, District Ex. S-10 (2014–2015 IEP) at 1, AR 00196.

[6] 2014–2015 IEP at 8–18, AR 00203–213.

[7] *See* Hr'g Officer Decision at 5–6, ¶¶ 25–28, AR 01600–01. The Progress Report dated June 18, 2014, District Exhibit S-12, was not included within the administrative record.

[8] Reevaluation Report at 28–30, AR 00287–89.

[9] *Id.* at 12–14, AR 00271–73.

[10] Hr'g Officer Decision at 7–8, ¶¶ 38–51, AR 01602–03 (citing Independent ABA Evaluation Report by Amy McGinnis, January 29, 2015, Parent Ex. P-11 (McGinnis Report P-11), at 1–11, AR 01192–99).

[11] McGinnis Report P-11 at 61, AR 01252.

[12] IEP, March 31, 2015, District Ex. S-17 (2015–2016 IEP) at 14, AR 00311.

[13] Hr'g Officer Decision at 1, 27, AR 01596, 01622.

[14] ABA is the science of studying behavior using data-driven approaches to increase or decrease meaningful behaviors. Hr'g Tr. Vol. III at 301, AR 01461.

[15] Pl. Mem. in Supp. of Mot. for Summ. J. (Doc. No. 12) at 9; McGinnis Report P-11 at 38, AR 01229.

[16] 2015–2016 IEP at 14, AR 00311.

[17] Def. Resp. in Opp'n to Mot. for Summ. J. (Doc. No. 14) at 4 (citing Hr'g Tr. Vol. III at 464–65, AR 01501–02).

[18] Def. Br. in Supp. of Mot. for Summ. J. at 9 (citing Hr'g Tr. Vol. III at 249–50, AR 01448).

[19] SUF ¶ 96.

[20] Hr'g Tr. Vol. III at 465, AR 01502.

[21] Def. Resp. at 3 (citing Reevaluation Report at 24, AR 00283).

[22] *Id.* (citing Reevaluation Report at 25, AR 00284).

[23] Reevaluation Report at 10, 12, 25, 28–29, AR 00269, 00271, 00284, 00287–88.

[24] Def. Resp. at 3–4 (citing Reevaluation Report at 9–14, 25, 28–29, AR 00268–73, 00284, 00287–88).

[25] Reevaluation Report at 24, AR 00283.

[26] 2014–2015 IEP at 12, AR 00207.

[27] *Id.* at 14–15, AR 00209–10.

[28] *Id.* at 14, AR 00209.

[29] *Id.* at 15, AR 00210.

[30] Reevaluation Report at 22, AR 00281.

[31] Hr'g Tr. Vol. III at 242–43, AR 01446. She has supervised the implementation of a child's ABA program "dozens" of times and has been retained by a school district on approximately five of those occasions. *Id.* Although she has consulted for school districts, she has never worked in a public school setting nor does she have any experience in public school teaching. *Id.* at 298–300, AR 01460.

[32] Hr'g Officer Decision at 15, AR 01610.

[33] Hr'g Tr. Vol. III at 386–88, AR 01482.

[34] Hr'g Tr. Vol. IV at 532–33, AR 01519–20.

[35] *Id.* at 475, AR 01505.

[36] Hr'g Tr. Vol. II at 196–98, AR 01433–34.

[37] *Id.* at 9–12, AR 01386–87.

[38] *See, e.g.*, Hr'g Officer Decision at 15, AR 01610.

[39] Hr'g Tr. Vol. III at 325–26, AR 01467.

[40] *Id.*

[41] Examples of such behavior that impede T.M.'s learning include teeth-grinding, yelling, throwing objects, displaying aggression, grunting, whining, flapping his arms or running away.

[42] 2014–2015 IEP at 53, AR 00248.

[43] Def. Resp. at 5.

[44] McGinnis Report P-11 at 25, AR 01226.

[45] Pl. Mot. for Summ. J. at 17.

[46] Hr'g Tr. Vol. III at 325–26, AR 01467.

[47] *Id.*

[48] Def. Resp. at 5 (citing Hr'g Tr. Vol. III at 390–91, AR 01483).

[49] *Id.*

[50] *Id.* (citing Hr'g Tr. Vol. II at 113, AR 01412).

[51] 2014–2015 IEP at 52, AR 00247.

[52] *Id.* at 53, AR 00248.

[53] *See, e.g.*, *id.* at 35, AR 00230.

[54] 2015–2016 IEP at 27–51, AR 00324–48.

[55] 2014–2015 IEP at 12, AR 00207.

[56] *See id.* at 35, AR 00230.

[57] *Id.* at 56, AR 00251.

[58] *Id.* at 53–54, AR 00248–49.

[59] Reevaluation Report at 13, AR 00272.

[60] 2015–2016 IEP at 11, AR 00308.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 49, AR 00346.

[64] *Id.*

[65] Pl. Mot. for Summ. J. at 15, 24; Pl. Resp. (Doc. No. 15) at 6–7.

[66] Pl. Mot. for Summ. J. at 24.

[67] 2015–2016 IEP at 15, AR 00312.

[68] *Id.*

[69] *Id.* at 60–64, AR 00357–61; 2014–2015 IEP at 38–42, AR 00233–37; Hr'g Tr. Vol. I at 206–09, 218–19, AR 01371, 01374.

[70] Hr'g Tr. Vol. I at 218–19, AR 01374.

[71] *See, e.g.*, 2015–2016 IEP at 65, AR 00362.

[72] 2014–2015 IEP at 33, AR 00228.

[73] *Id.* at 34, AR 00229.

[74] 2015–2016 IEP at 36, AR 00333.

[75] *Id.* at 37, AR 00334.

[76] Reevaluation Report at 11, AR 00270.

[77] 2015–2016 IEP at 12, AR 00309.

[78] *Id.*

[79] *Id.* at 51, AR 00348.

[80] Pl. Resp. at 8–9.

[81] The IDEA requires that each state establish:

> procedures to ensure that . . . to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5); *Rowley*, 458 U.S. 202–03 & n.24.

[82] Pl. Resp. at 7.

[83] McGinnis testified that the programming "could be classroom time. It could be provided across environments as well. I didn't make a specific recommendation for where it had to be provided." Hr'g Tr. Vol. III at 349–50, 358, 376, AR 01473, 01475, 01479.

[84] *Id.* at 351, AR 01473.

[85] *Id.* at 293, AR 01459.

[86] *Id.* at 354–55, AR 01474.

[87] Hr'g Officer Decision at 23, AR 01618.

[88] Hr'g Tr. Vol. II at 165–66, AR 01425–26; 2014–2015 IEP at 47, 56, AR 00242, 00250; 2015–2016 IEP at 69, AR 00366.

[89] Hr'g Tr. Vol. II at 166–67, AR 01425–26.

[90] Reevaluation Report at 24–25, AR 00283–84.

[91] *Id.*

[92] 2015–2016 IEP at 63, AR 00360.

[93] Hr'g Tr. Vol. II at 167, AR 01426.

[94] Independent ABA Evaluation Report by Amy McGinnis, February 22, 2016, Parent Ex. P-13 (McGinnis Report P-13) at 36, AR 01290.

[95] 2015–2016 IEP at 14, AR 00311.

[96] *Id.*

[97] Hr'g Officer Decision at 25, AR 01620.

[98] McGinnis Report P-13 at 33, AR 01287.

[99] *Id.*

[100] *Id.* at 36, AR 01290.

[101] *Id.* at 37, AR 01291.

[102] Hr'g Officer Decision at 26, AR 01621; Hr'g Tr. Vol. IV at 560–61, 591–99, AR 01526–27, 01534–36.